**FIFTH DIVISION**
**MCFADDEN, P. J.,**
**BROWN and MARKLE, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**March 3, 2023**

# In the Court of Appeals of Georgia

A23A0174. FREEMAN v. THE STATE.

BROWN, Judge.

Following a jury trial, Christopher Freeman was convicted of rape, burglary in the first degree, aggravated assault, and robbery by force. Freeman appeals his convictions and the denial of his motion for new trial, as amended, asserting three enumerations of error: insufficiency of the evidence to support his conviction for aggravated assault, trial court error in failing to grant a motion in limine, and ineffective assistance of counsel. For the reasons explained below, we affirm.

The evidence presented at trial, viewed in the light most favorable to support the verdict, *Patch v. State*, 337 Ga. App. 233, 235 (1) (786 SE2d 882) (2016), showed that in the early morning hours of April 8, 2018, the victim was asleep in her bed. Her young son was spending the night out and she was alone in her home when she was

awakened by her dog barking. She got out of bed to turn on the light and observed a masked and gloved man, later identified as Freeman, standing outside her bedroom door. Freeman ran towards the victim and grabbed her by the neck and face. Freeman lifted the victim by the neck and arm, tried to pry open her legs, and repeatedly told her to "shut the fuck up" and "I'm finna to fuck you up." The victim lost consciousness during the attack and woke up to Freeman grabbing her by the neck and flipping her over on the bed. The victim testified that Freeman "had total control of [her] body[;] [she] was his puppet." At some point during the attack, Freeman removed the victim's underwear and penetrated her vagina. He told the victim he knew she had a son, demanded access to her cell phone, went through her purse looking for her wallet, told her he had given her his number before but that she never called him, and dragged her by her hair around the room. Freeman threw the victim in the tub, grabbed her by the hair again, turned on the water, and told the victim to "wash [her] pussy." At some point, Freeman saw a camera attached to the wall. He tore down the camera, threw it in the tub with the victim and demanded that the victim show him where the camera was connected. Freeman then grabbed the victim out of the tub by her hair, dragged her down the stairs to the home's office, sat her in a fetal position, and then began "pulling out all the cords."

2

Freeman then dragged the victim back up the stairs, threw her back on the ground in her bedroom and attempted to rape her again but could not achieve an erection, so he began rubbing his penis on her vagina, and kissing her breasts and neck. According to the victim she "was pissed . . . pissed he was rubbing his penis on me, he was kissing me on my breasts and on my neck, and I told him I was mad. I told him: Get off of me. . . . I told him: What are you doing? Are you raping me or are you making love to me? Because at this point, he laughed." At that point, Freeman had laid the victim down on her bed and she heard her curling iron turn on and beep. When the victim heard the beep of her curling iron, she started crying. The victim told Freeman "to please not hurt [her]." She recalls being really scared because she "didn't know what [Freeman] was going to do with the curling iron." The victim explained that Freeman fled when the victim heard a "pole drop, which it always drops and makes the same sound all the time. My son always plays on the steps and it makes the same sound, I knew what it was when it hit the ground and I just started screaming: Babe, I'm up here, I'm up here. Please come get me, come get me." The victim then grabbed a baseball bat and ran to a neighbor's house.

The neighbor testified that the victim was visibly shaking and holding a baseball bat. The victim told the neighbor that someone had broken into her house

3

and raped her and taken her cell phone. The neighbor called police. The victim never returned to her house because she did not feel safe. She moved in with her brother and then sold the home.

A sexual assault examination was performed on the victim and revealed the presence of Freeman's DNA on the vaginal/cervical, breast, and labial swabs taken from the victim. The nurse who conducted the victim's sexual assault examination also noted that the victim had an abrasion on her neck and inside her cheek and bruising under her right jaw and down her right shin, right thigh, as well as on her right upper back toward the neck area. She also had bruising on the left side of her back as well as a small bruise on her right forearm.

After police determined Freeman's identity, they discovered that he lived in the same neighborhood as the victim in a home approximately 500-600 feet from the victim's home. A neighbor who has known Freeman since he was a child testified at trial that Freeman left the area after the attack and was going "back and forth to Florida" because he was aware that detectives were in the area. At some point during this time, the neighbor had a conversation with Freeman where Freeman advised the neighbor that "he had done something unforgivable three times." Shortly after that conversation, Freeman was arrested.

4

Freeman testified at trial. He claimed that he had met the victim twice, once at a neighbor's house and again when he returned her dog to her. Freeman testified that after he returned the dog to her, the two began a consensual sexual relationship. Freeman denied ever having non-consensual sex with the victim. According to Freeman, he had sex with the victim four or five times, including once in the early evening hours of April 7, 2018. Freeman denied raping the victim, stealing her cell phone, and turning on her curling iron in an attempt to assault her with it.

1. Freeman contends there was insufficient evidence of a demonstration of violence to support the jury's verdict on the aggravated assault charge. We disagree.

> When a criminal defendant challenges the sufficiency of the evidence supporting a conviction, we view the evidence in the light most favorable to the verdict, and the defendant no longer enjoys a presumption of innocence. As an appellate court, we do not weigh the evidence, judge the credibility of witnesses, or resolve evidentiary conflicts. The relevant question for this court is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. As long as there is some competent evidence to support each element necessary to make out the state's case, the jury's verdict will be upheld.

(Citations omitted.) *Lawson v. State*, 275 Ga. App. 334, 335 (1) (620 SE2d 600) (2005). "A person commits the offense of aggravated assault when he or she assaults:

5

. . . [w]ith a deadly weapon or with any object, device, or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury." OCGA § 16-5-21 (a) (2). "Central to the offense of aggravated assault is that [a simple] assault as defined in OCGA § 16-5-20 be committed on the victim." (Citation and punctuation omitted.) *Chase v. State*, 277 Ga. 636, 637 (1) (592 SE2d 656) (2004). "The State may prove an assault by showing that the defendant committed an act that placed the victim in reasonable apprehension of immediately receiving a violent injury." (Citation and punctuation omitted.) *Thompson v. State*, 332 Ga. App. 204, 210 (2) (770 SE2d 364) (2015).

The indictment charged Freeman with aggravated assault for making an "assault upon the person of [the victim] with a curling iron, an instrument which, when used offensively against a person, is likely to result in serious bodily injury by turning it on and threatening to burn her with it." Given Freeman's threatening and forceful actions and demeanor throughout the attack and the victim's testimony that she was really scared and that she started to cry when she heard Freeman turn on her curling iron, coupled with her testimony that she told Freeman not to hurt her, we conclude that a rational trier of fact could have found that Freeman committed an act

6

that placed the victim in reasonable apprehension of immediately receiving a violent injury.

Freeman contends that the act of turning on the curling iron was not an assault because there was no threat of imminent harm. Freeman also contends that because there is no evidence that he ever picked up the curling iron, there is no "evidence of a volitional act sufficient to constitute an assault." We disagree. "A person commits the offense of simple assault when he or she either: (1) Attempts to commit a violent injury to the person of another; *or* (2) Commits an act which places another in reasonable apprehension of immediately receiving a violent injury." (Emphasis supplied.) OCGA § 16-5-20 (a).

> To prove that a victim had a reasonable apprehension of immediately receiving a violent injury, there need not be an actual present ability to commit a violent injury upon the person assailed, but if there be such a demonstration of violence, coupled with the apparent ability to inflict the injury, so as to cause the person against whom it is directed reasonably to fear the injury unless he retreat to secure his safety, and under such circumstances he is compelled to retreat to avoid an impending danger, the assault is complete, though the assailant may never have been within actual striking distance of the person assailed.

(Citation and punctuation omitted.) *Thompson*, 332 Ga. App. at 211 (2) (770 SE2d 364) (2015). "Moreover, assault is an attempted battery, so the state must show that the defendant made a substantial step toward committing the battery." (Citation and punctuation omitted.) *Pettis v. State*, 350 Ga. App. 421, 423 (1) (829 SE2d 613) (2019).

The State presented evidence showing that the victim endured a brutal rape and attack in her own home in the middle of the night. During the attack, Freeman dragged the victim up and down the stairs by her neck, arms, and hair, repeatedly telling her that he was going to "fuck [her] up." The victim testified that she was really scared and started crying when Freeman turned on her curling iron immediately after laying her down on the bed after he unsuccessfully attempted to penetrate her. Immediately after the victim heard Freeman turn on the curling iron, the victim began crying and screaming for help. Under these circumstances, Freeman's act of turning on the curling iron, by itself, constituted a substantial step toward committing a battery and a demonstration of violence against the victim, and showed a present ability to inflict injury which placed the victim in reasonable apprehension of immediately receiving a violent injury. See *In the Interest of T. Y. B.*, 288 Ga. App. 610, 612 (654 SE2d 688) (2007) (affirming adjudication for aggravated assault where

8

juvenile, after angrily cursing and screaming at his mother, took a pot of boiling water off of the stove and stood outside her bedroom door holding the pot and staring at her before walking away). See also *Daniels v. State*, 298 Ga. App. 736, 737-738 (681 SE2d 642) (2009) (evidence including that defendant blocked the victim from escaping his presence as he shouted at her "authorize[d] the jury to find that [the victim] feared she would receive an 'immediate violent injury' and that her fear was reasonable"). That Freeman was prevented from consummating whatever violent act or injury he was planning because the victim's screams prompted him to flee the scene does not mean that the evidence was insufficient to authorize his conviction. Cf. *Harrison v. State*, 60 Ga. App. 610, 611-613 (4 SE2d 602) (1939) (affirming conviction for assault where defendant reached for lamp on mantle just as the victim ran out of the door and defendant then threw the lamp).

2. Freeman contends that the trial court erred in failing to grant a motion in limine in which his counsel sought to cross-examine the victim as to her prior sexual history as an exception to Georgia's Rape Shield Statute, OCGA § 24-4-412. We find no error.

The victim testified that at the very beginning of the attack, Freeman removed her underwear while she was lying on the ground and Freeman was prying open her

9

legs. A crime scene specialist with the Gwinnett County Police Department testified that she collected the underwear from the crime scene and that she tested a stain or area of discoloration on the interior lining using an acid phosphate test, which showed the "presumptive presence of semen." The specialist explained that this "presumptive presence" does not mean that "it's definitely semen." When asked on cross-examination if "you can test for it and get a positive test for it within 24 to 48 hours, depending on conditions," the specialist replied that "Yes, it's possible." According to Freeman, the victim had told a detective investigating the crime in an email exchange that she had not had sex for five days prior to the rape. This information was shared with Freeman as part of pretrial discovery, but not introduced at trial.

After the crime scene specialist testified, Freeman made an oral motion in limine pursuant to the Rape Shield Statute, arguing that the victim's statement to police was contradicted by the positive semen test and that he was, therefore, entitled to cross-examine the victim as to her prior sexual history due to the discovery of semen at the crime scene. The State objected, explaining that the substance on the underwear had never been tested, that the question Freeman sought to ask was "classic rape shield information," and that the State had offered the underwear into evidence simply so the jury could "see the steps that were taken" at the crime scene

10

and the items "that were taken from that scene." The trial court denied the motion in limine.

On appeal, Freeman contends he needed to impeach the victim for several reasons. Freeman's sole defense was that he knew the victim and had consensual sex with her in the same room earlier that evening. Thus, since the victim denied knowing Freeman, the defense needed to prove her to be untruthful. Freeman's confrontation rights were violated by the denial of his motion: "He had the right to prove that the sex he had with [the victim] was consensual, and that the assailant was somebody else."

"The trial court's decision whether to admit or exclude evidence will not be disturbed on appeal absent an abuse of discretion." (Citation and punctuation omitted.) *Torres v. State*, 353 Ga. App. 470, 478 (3) (838 SE2d 137) (2020). Georgia's Rape Shield Statute prohibits evidence regarding a complaining witness' past sexual behavior, with limited exceptions. OCGA § 24-4-412. Those exceptions are:

> (1) Evidence of specific instances of a victim's or complaining witness's sexual behavior, if offered to prove that someone other than the defendant was the source of semen, injury, or other physical evidence;

11

(2) Evidence of specific instances of a victim's or complaining witness's sexual behavior with respect to the defendant if it supports an inference that the accused could have reasonably believed that the complaining witness consented to the conduct complained of in the prosecution;

(3) Evidence of specific instances of a victim's or complaining witness's sexual behavior with respect to the defendant or another person if offered by the prosecutor; and

(4) Evidence whose exclusion would violate the defendant's constitutional rights.

OCGA § 24-4-412 (b). As the Supreme Court of Georgia stated in *White v. State*, 305 Ga. 111 (823 SE2d 794) (2019), "a natural reading of the text of OCGA § 24-4-412 indicates that evidence of a complaining witness's past sexual behavior may not be introduced by any party at a trial involving a prosecution for [rape] unless such evidence falls under [a] specific exception contained in the statute itself." Id. at 115 (1). "Evidence of a complaining witness's past sexual history that falls outside of [a] specific exception contained in OCGA § 24-4-412 is inadmissible in any prosecution to which the Rape Shield Statute applies and may not be introduced by either party as direct evidence or on cross-examination of the complaining witness or other witnesses." (Punctuation omitted.) Id. at 116 (1), citing OCGA § 24-4-412 (a). There

12

is no merit to Freeman's contention that he was entitled to cross-examine the victim as to her prior sexual history due to the discovery of semen at the crime scene in order to prove that the sex he had with the victim was consensual and that the assailant was somebody else. The underwear was never tested and Freeman has not offered any evidence of the source of the alleged semen. To the extent Freeman sought to cross-examine the victim in order to test her veracity, the Supreme Court of Georgia expressly held in *White* that "[t]here is no exception written into the statute for any party to introduce evidence of a complaining witness's sexual behavior that is 'otherwise relevant' but that falls outside of the scope of [the] statutory exception[s]" contained in OCGA § 24-4-412 (b). 305 Ga. at 118 (2). To the extent Freeman suggests that the exception provided in subsection (b) (4) applies and that he was denied his constitutional right of confrontation, we are not persuaded.

In *Jones v. Goodwin*, 982 F.2d 464 (11th Cir. 1993), the defendant made a similar argument: That "the trial court contravened his constitutional right of confrontation by excluding evidence proffered (1) for impeachment and (2) to establish, from circumstantial evidence of [the victim's] past sexual behavior, that [the victim] consented to sexual intercourse with [the defendant]." Id. at 469 (II) (A). But, as the Eleventh Circuit recognized, "the proffered testimony was irrelevant for

[the purpose defendant sought to use it] because it would have neither contradicted nor impeached anything [the victim] said while on the witness stand, or, for that matter, anything presented in the [S]tate's case." Id. at 469 (II) (A) (1). Likewise, in this case, the victim never testified that she had not sex for five days prior to the rape. This statement was made in email to a detective that was only made out of court. Because the jury was never made aware of the statement there was nothing for Freeman to impeach. Moreover, as the State points out, nothing about the victim's past sexual behavior with other people shows that she knew — or did not know — Freeman or consented to the sexual encounter with him. The trial court correctly denied Freeman's motion in limine.

3. Freeman contends trial counsel was ineffective for failing to provide the State with the notice of intent required by OCGA § 24-4-412 (c). As set forth above, during his trial, Freeman moved in limine to cross-examine the victim as to her prior sexual history due to the discovery of semen at the crime scene on the grounds that the evidence was admissible as an exception to the Rape Shield Statute, OCGA § 24-4-412 (b). The trial court considered Freeman's motion and denied it.

> In evaluating claims of ineffective assistance of counsel, we apply the two-pronged test established in *Strickland v. Washington*, 466 U. S.

14

668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984), which requires a defendant to show that his trial counsel's performance was deficient and that the deficient performance so prejudiced him that there is a reasonable likelihood that, but for counsel's errors, the outcome of the trial would have been different. Additionally, there is a strong presumption that trial counsel's conduct falls within the broad range of reasonable professional conduct, and a criminal defendant must overcome this presumption.

(Citation and punctuation omitted.) *Brown v. State*, 362 Ga. App. 377, 380-381 (2) (868 SE2d 493) (2022). The failure to satisfy either prong of the *Strickland* test is fatal to a claim of ineffective assistance of counsel. *Prothro v. State*, 302 Ga. 769, 772 (II) (809 SE2d 787) (2018). OCGA § 24-4-412 (c) provides that:

The procedure for introducing evidence as described in subsection (b) of this Code section shall be as follows:

(1) If a party intends to offer evidence under subsection (b) of this Code section, the party must:

(A) File a motion that specifically describes the evidence and states the purpose for which it is to be offered; and

(B) Do so at least three days before trial unless the court, for good cause, sets a different date; and

15

(2) Before admitting the evidence under this Code section,the court shall conduct an in camera hearing to examine the merits of the motion.

While the record is clear that Freeman's motion in limine was untimely in that it was filed during trial and not three days before trial, the trial court considered the merits of the motion after excusing the jury and without any objection from the State. Moreover, there is no evidence that the outcome of the trial would have been different if the motion had been filed earlier. Indeed, as we hold in Division 2, the trial court correctly denied the motion. Accordingly, there is no merit in this enumeration. "The failure to make a meritless motion or objection does not provide a basis upon which to find ineffective assistance of counsel." (Citation and punctuation omitted.) *Clarke v. State*, 356 Ga. App. 580, 592 (3) (a) (848 SE2d 192) (2020).

*Judgment affirmed. McFadden, P. J., and Markle, J., concur*.